Filed 9/3/15  CalPOP.com v. Hoover CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CALPOP.COM, INC., | B252595 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC455663) |
| v. | |
| RICHARD LAND HOOVER, | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

The opinion filed on August 6, 2015, is modified as follows:

On page 1, line 3, change "Richard L. Hoover, in pro. per., for Defendant and Appellant" to "Law Offices of Armand Tinkerian, Armand Tinkerian and Richard L. Hoover, in pro. per., for Defendant and Appellant."

_____     _____     _____

TURNER, P.J.                          KRIEGLER, J.                         KIRSCHNER, J.[*]

_____

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/6/15  CalPOP.com, Inc. v. Hoover CA2/5 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| CALPOP.COM, INC., | B252595 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC455663) |
| v. | |
| RICHARD LAND HOOVER, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Affirmed.

Richard L. Hoover, in pro. per., for Defendant and Appellant.

Scott Sayre for Plaintiff and Respondent.

# I.  INTRODUCTION

Defendant, Richard Land Hoover, appeals from a judgment against him for fiduciary duty breach.  Plaintiff, CalPOP.com, Incorporated, brought a fiduciary duty breach cause of action against defendant.  Plaintiff alleged defendant, as its president and chief financial officer, misused and mismanaged corporate funds for his personal use.  Following a bench trial, the trial court found in favor of plaintiff.  Defendant contends: plaintiff lacked standing to bring the action; his financial actions were entitled to deference under the business judgment rule; and certain evidence was inadmissible.  Defendant also briefly raises several other arguments on appeal, including extreme bias by witnesses, inadequate time for his defense and insufficient evidence to support the judgment.  None of defendant's arguments have merit.  We affirm the judgment.

# II.  BACKGROUND

## A.  Plaintiff's First Amended Complaint

Plaintiff initiated this action against defendant on February 22, 2011.  Plaintiff filed a first amended complaint on March 9, 2011 against defendant for fiduciary duty breach, conversion and fraud.  Plaintiff alleges the following.  Plaintiff is a California corporation providing internet service, co-location hosting, dedicated server rental and internet connectivity for commercial businesses and customers.  From 2007 through 2011, defendant served as plaintiff's president and chief executive officer.  Defendant also served on the board of directors until his removal by shareholder vote.  In those capacities, defendant owed a duty of loyalty, due care, honesty and complete disclosure to plaintiff.

Defendant breached his duties to the corporation by diverting corporate resources for his own personal benefit.  The alleged list of fiduciary duty breaches include: embezzled funds; gambled-away company funds; using company money for purchase of

2

illicit drugs; payment of prostitutes with company funds; paying for sex and dating websites with company funds; use of official company e-mail accounts to solicit sex; sexual harassment of company employees; use of company funds to pay for a personal assistant to live with him; forging corporate books and records and back-dated documents; issuing unauthorized shares to himself and others; misrepresentation of the content of various documents to other officers and directors of the company to obtain their signatures; and causing the company to engage in unlawful conduct and thus exposing it to potential criminal and civil liability.

On February 19, 2011, after he was informed of his employment termination, defendant attempted to disrupt the company's services and ongoing operations. He entered the premises and interfered with other employees' ability to work. He attempted to withdraw more than $20,000 from plaintiff's bank account the day that payroll was due. Defendant did this to destroy the plaintiff as retribution. Defendant also formed an illegal law firm which was funded with company funds. Plaintiff sought as relief: actual damages of over $100,000; general and consequential damages of over $1 million; and punitive damages of over $10 million. The fiduciary duty breach cause of action was the only cause of action to proceed to trial.

## B. Bench Trial

No jury fees were submitted for a jury trial. The parties estimated 2 to 3 days each to present their case. The trial occurred over 13 days. The trial concluded on May 1, 2013.

## 1. Defendant's Testimony

Plaintiff was incorporated in 2002. Defendant testified plaintiff was involved with selling websites, search engines, nightclubs, renting space and internet marketing, in addition to providing internet servers. At the time of incorporation, plaintiff was

3

authorized to issue up to 1,500 shares. Initially, 500 shares were issued to defendant, Everett Van Niekerk and Ross Thiers. Mr. Van Niekerk, Mr. Thiers and defendant comprised the initial directors board. In April 2004, Mr. Thiers transferred 75 shares to Klein Lee. Also in April 2004, Mr. Van Niekerk transferred 75 shares to Kiarash Jahangiri. In June 2004, Mr. Van Niekerk and Mr. Thiers transferred 15 shares each to Ken Joostens. Thus, as of June 2004: Mr. Van Niekerk and Mr. Thiers owned 410 shares each; Mr. Joostens had 30 shares; Mr. Lee and Mr. Jahangiri owned 75 shares each; and defendant owned 500 shares. In 2007, Mr. Thiers sold his remaining stock shares back to plaintiff and left plaintiff. At one point, defendant served as plaintiff's chief executive and financial officer and secretary.

Defendant testified he had 49,471 voting shares, which represented 86.1 percent of all outstanding shares. Defendant testified he had 71 shares of what he termed "class B voting shares" that were the equivalent of 7,100 class A voting shares. Defendant admitted that these class B voting shares were not authorized anywhere in the articles of incorporation. During a deposition, defendant testified he did not recall spending advertising money for a dentist service or the law firm of 123 Defender.

Defendant testified Mr. Van Niekerk resigned from the directors board in August 2008. Defendant testified Matthew Corwin and John Bramlett were on plaintiff's directors board from around September 1, 2008, until their removal on October 26, 2010, during an annual stockholder meeting. Defendant stated Aniko Rushakoff and Tony Wagoner replaced them as directors.

Defendant admitted giving no notice of a October 2010 shareholder meeting to Mr. Lee, Mr. Jahangiri or Mr. Joostens. Defendant had no record of the October 2010 shareholder meeting's minutes. Defendant stated Mr. Jahangiri, Mr. Lee and Mr. Joostens had failed to update their addresses and plaintiff eventually stopped sending them notices. Defendant also admitted giving no notice of an emergency shareholder meeting on February 13, 2011. At that meeting, Mr. Corwin and Mr. Bramlett were purportedly removed from the directors board. The only purported notice of this

4

February 13, 2011 shareholder meeting was provided in March 2011 by e-mail. Defendant did receive notice of plaintiff's February 21, 2011 directors board meeting.

Defendant testified to removing Ms. Rushakoff and Mr. Wagoner as directors on February 13, 2011. Defendant testified he had several shareholder meetings on February 13, 2011. Defendant stated he removed Ms. Rushakoff but then thought about placing her back as a director the same day. Defendant removed Mr. Van Niekerk as a director by written consent on February 19, 2011.

Defendant testified the Secretary of State filed an amendment to plaintiff's articles of incorporation on February 25, 2009. Defendant asserted the amendment was approved and adopted January 10, 2003. Defendant admitted that on February 21, 2009, a statement of information was sent to the Secretary of State. That statement of information indicated Mr. Corwin, Mr. Bramlett, Mr. Van Niekerk and defendant were members of plaintiff's directors board. On October 26, 2010, another statement of information was sent to the Secretary of State which defendant purported to send. It indicated there had been no change in any of the dates included in the prior information statement. Defendant testified he did not send those information statements and may have delegated the task to an accountant. Defendant, as the plaintiff's secretary, was responsible for keeping the corporate records in an orderly manner.

Defendant testified that plaintiff was paying $500 a month for a loan from John Liu. It was to repay a loan regarding an escrow. Defendant did not recall ever having a personal account with Scottrade. Defendant did not recall having a United Services Automobile Association credit card.

Defendant purported to remove Mr. Van Niekerk as a director by written consent on February 19, 2011. Defendant stated in his deposition that he did not execute this action until February 28, 2011, though it was purportedly effective earlier. Defendant testified to attending a meeting on March 4, 2011 of plaintiff's purported shareholders. At this meeting, defendant voted all of his shares to appoint his own slate of directors.

5

## 2. Mr. Corwin's Testimony

### a. Overview

Mr. Corwin was hired by plaintiff in October of 2007. He became director of sales in December of 2007 or January of 2008. Mr. Corwin became plaintiff's chief executive officer on February 21, 2011. Mr. Corwin was a member of plaintiff's directors board since 2008 along with Mr. Van Niekerk, Mr. Bramlett and defendant. Mr. Corwin had expertise with accounting due to his experiences gained at plaintiff and his educational background. Mr. Corwin had completed the core courses for a bachelor of science in business administration prior to February 13, 2011. Mr. Corwin was also a law student at the time he testified.

In October 2010, Mr. Corwin learned of a check issued to defendant from plaintiff in the amount of $47,000. Defendant issued the check to himself. Mr. Corwin asked defendant about the funds. Defendant replied that the money was to be spent on a lake house with Ms. Rushakoff, his girlfriend at the time. Only $30,000 was returned to plaintiff. Mr. Corwin consulted the other board members. They agreed that Mr. Corwin should review plaintiff's financial records. Mr. Corwin also consulted Tamara Malisich, plaintiff's bookkeeper.

Mr. Corwin compiled a list of personal expenditures by defendant using company funds. Mr. Corwin compiled this list from plaintiff's QuickBooks records, business records, NuVision Federal Credit Union and PayPal. Mr. Corwin identified expenditures from September 2007 through July 2011.

### b. defendant's expenditures involving plaintiff's PayPal account

Mr. Corwin found $3,552.50 of unauthorized withdrawals from plaintiff's PayPal debit card that only defendant used. Mr. Corwin labeled these withdrawals as "cash theft" by defendant. Defendant never submitted expense reports or receipts accounting

6

for the money withdrawn. In the "unauthorized on-line dating and sex sites" category, Mr. Corwin found $8,523.20 of expenditures from the plaintiff's PayPal account. Defendant spoke to Mr. Corwin about the expenditures. Defendant admitted he was engaging in relationships on the Internet. Mr. Corwin testified that as a director he would never have authorized company funds for this purpose.

Mr. Corwin identified unauthorized personal meals in the amount of $4,733.86. Defendant did not meet with clients and thus would not have reason to use company funds for meals. Mr. Corwin listed unauthorized online purchases in the amount $14,054.23. The items under this category did not have any business purpose, such as payments for an online music service and comic books. Mr. Corwin also did not find any business vendors who matched these expenditures.

In the off-line purchases category, Mr. Corwin testified defendant spent $2,816.10 from the corporate PayPal account. This included purchases from Albertson's Supermarket, Macy's, Vons, TJ Maxx, Blockbuster Video and IKEA. There was no record these purchases were used for a legitimate business expense on plaintiff's behalf. Defendant spent $2,000 from plaintiff's PayPal account for the use of legal services for his divorce. Mr. Corwin testified as to other miscellaneous personal expenditures, including trips to Cancun, Mexico and Las Vegas, an engagement ring and exercise equipment. Plaintiff does not have gym equipment at its data center. The amount of personal expenses was $15,566.15. None of these expenses were for any business purpose.

Mr. Corwin testified defendant spent $8,052.84 for trips to the Queen Mary Hotel and other places. This involved defendant and his then-girlfriend Ms. Rushakoff. Again, no expense reports were submitted. Mr. Corwin also testified defendant spent $4,607.58 from plaintiff's PayPal account for gas, water, and cable bills. Plaintiff paid its utilities through the building. Plaintiff would not have used Time Warner Cable for phone, internet and cable television. The total unauthorized expenditures by defendant with plaintiff's PayPal account was $63,906.46.

7

c.  defendant's expenditures involving plaintiff's NuVision account

Mr. Corwin testified defendant used $242,278 from plaintiff's bank account with Scottrade for the purpose of opening a personal account.  Plaintiff's directors board never authorized defendant to spend plaintiff's money on the stock market.  The transfer of money from plaintiff to Scottrade corresponded with defendant's personal Scottrade account.  According to Mr. Corwin, none of the money from its Scottrade account returned to it.  Plaintiff needed to update its equipment and would not have been in a position to have extra cash for stock trading.  There was also an online payment for IKEA for the amount of $732.21.  Mr. Corwin testified plaintiff had no IKEA furniture.  The total amount of online transfers Mr. Corwin determined were unauthorized from plaintiff's NuVision account was $243,010.21.

Mr. Corwin testified defendant misappropriated funds for cash withdrawals, checks and personal credit card payments.  Mr. Corwin found $60,098.73 in misappropriated funds.  Several of the charges included payment for a United Services Automobile Association credit card in defendant's name.  In order to receive a United Services Automobile Association credit card, one must be a military veteran or a relative of a military veteran.

Mr. Corwin testified defendant wrote $50,000 of plaintiff's checks to himself and repaid only $30,000.  Mr. Corwin testified defendant wrote a check to RJR Productions in the amount of $4,465.50.  RJR Productions is not a vendor for plaintiff.  There was no invoice for this expenditure.  Defendant spent $777 of plaintiff's funds for advertising with Radio Mall and Audio Video LA.  Defendant spent $9,524.62 of plaintiff's funds for personal meals.  Defendant submitted no receipts for these expenses.

Mr. Corwin testified defendant attempted to create a competitor to Google by building a search engine.  Defendant had no business or marketing plan and did not have directors board approval.  Defendant spent $7,787.55 of plaintiff's funds on this unsuccessful search engine development venture.  Mr. Corwin testified defendant spent

8

funds on domain name registration fees that were unrelated to plaintiff's business. Defendant spent $1,601.28 of plaintiff's funds.

Mr. Corwin testified defendant spent $959.94 for personal shopping expenses from plaintiff's funds. Included in these expenses were photography services. Defendant had photographs taken of himself at plaintiff's data center which were then posted on the internet. These pictures harmed plaintiff's reputation. Mr. Corwin testified defendant spent plaintiff's funds on personal services that had no relation to plaintiff. This included money spent to produce a music album. The total expenditures were $6,646.34.

Mr. Corwin testified defendant spent $2,134.22 of plaintiff's funds on personal software. He could find no link to a vendor of plaintiff or any business purpose. Mr. Corwin testified defendant spent $3,211.51 of plaintiff's funds on personal automobile expenses. Plaintiff did not have any automobiles, nor did it provide transportation services for its employees.

Mr. Corwin testified defendant spent $15,667.76 of plaintiff's funds on personal credit card expenses. This included payments regarding the United Services Automobile Association and Credit One Bank credit cards, neither of which plaintiff used. Mr. Corwin testified defendant spent $2,500 of plaintiff's funds on Thomas Masters cabinets. Plaintiff did not own any Thomas Masters cabinets.

Mr. Corwin testified defendant spent $44,049.30 of plaintiff's funds on miscellaneous expenses. This included payments for a mortgage, escrow to purchase a house, food and a trip to Cancun. Plaintiff did not own real property. None of these charges were related to a business purpose.

Mr. Corwin testified defendant spent $555.44 on personal entertainment expenses including the Shrine Auditorium, the Arclight Hollywood and the Ambiance Villas Cancun. Mr. Corwin knew of no business purpose for these expenses. Mr. Corwin testified defendant spent $1,169.71 on travel expenses and $3,234.69 on travel and entertainment which were not business-related using plaintiff's funds.

Mr. Corwin testified defendant spent $1,652.86 of plaintiff's funds on gas, electric and cable bills. The bills were incurred at plaintiff's residence. Plaintiff had no natural

gas fittings. Plaintiff also did not have a cable account. Mr. Corwin also testified as to other expenses debited by defendant from plaintiff's funds in the amount of $36,296.12. This included mortgage accounts, credit card payments and cash withdrawal.

Mr. Corwin testified defendant had used plaintiff's funds to rent space for a law firm known as 123 Defender. Defendant used plaintiff's funds to pay $50,128.60 in rent and fees for the firm. The 123 Defender law firm employed Ms. Rushakoff, plaintiff's then-counsel and defendant's girlfriend. Defendant used plaintiff's funds to pay for all of 123 Defender's expenses, including computer equipment, phone lines and advertising with Google. The 123 Defender law firm handled third-party criminal cases. The cost to plaintiff for two separate Google advertising campaigns for 123 Defender was $10,236.58 and $25,967.15. Mr. Corwin also testified that plaintiff's Google advertising account paid for advertising involving a dentist. The total cost to plaintiff for the dentist advertising was $932.69. In support of Mr. Corwin's testimony, plaintiff submitted its NuVision, PayPal and Google account records which reflected these expenditures. Mr. Corwin authenticated the exhibits demonstrating his findings above and each exhibit was accepted into evidence.

### d. Hanmi Bank loan

Plaintiff took out a loan from Hanmi Bank in the amount of $975,000 for the purpose of buying office equipment. Mr. Corwin testified that after review of the vendor files and disbursed checks, $298,000 of the bank loan was not used for business purposes. These funds were instead disbursed to vendors who were not in a business relationship with plaintiff.

### e. the directors board and plaintiff's shares

Mr. Corwin, Mr. Niekerk, Mr. Bramlett and defendant constituted plaintiff's directors board from September 2008 until February 22, 2011. Under the corporation's

by-laws, the elected directors held office until the next annual shareholders' meeting and their successors have been elected and qualified, or until earlier resignation or death. On February 22, 2011, Mr. Bramlett, plaintiff's current secretary, filed an information statement with the Secretary of State in which the named directors were Mr. Corwin, Mr. Niekerk and Mr. Bramlett. Mr. Corwin was the chief executive officer and chief financial officer at that time.

Mr. Corwin testified that defendant did not own over 85 percent of plaintiff's stock. Mr. Corwin stated defendant did not validly issue any stock. Plaintiff initially issued 1500 shares of Class A stock. Defendant, Mr. Van Niekerk and Mr. Theirs each received 500 shares. The articles of incorporation were amended in February 25, 2009. Stock issuance required approval of the board. The directors board did not issue any further stock to defendant. Mr. Corwin denied being removed from plaintiff's directors board on February 18 or 21, 2011.

There was a purported award of 400 class A shares to defendant on November 8, 2004. Mr. Corwin testified the issuance of these 400 shares was unauthorized. As of that date, no such shares were available as authorized under the articles of incorporation. Similarly, another 400 shares was purportedly issued to defendant on March 9, 2006. No such shares were available as authorized under the articles of incorporation. Finally, the co-presidents, Mr. Van Niekerk and Mr. Thiers, and defendant were purportedly each issued an additional 400 shares. However, no such shares were validly authorized or issued under the articles of incorporation.

Mr. Thiers sold back all of his 410 shares of stock on June 27, 2007. Mr. Van Niekerk sold back 205 of his 410 shares of class A stock on July 16, 2007. As of December 31, 2007, the following persons owned class A shares in plaintiff: defendant owned 500 shares; Mr. Van Niekerk owned 205 shares; Mr. Klein and Mr. Jahangiri owned 75 shares each; and Mr. Joostens owned 30 shares.

Mr. Corwin testified that a purported reissuance of stock, which plaintiff repurchased from Mr. Thiers, back to its officers in 2007 was another unauthorized transaction. Only two of the shareholders signed the minutes of the purported

11

shareholder meeting where the purported reissuance occurred. Additionally, only the directors board had the authority to issue stock shares. In July 2007, a purported issuance of 1500 class A stock shares to defendant was also unauthorized. There was no evidence of a shareholder meeting and the issuance was done by only two of the three directors against the corporate by-laws. Mr. Bramlett, the third director at that time, did not sign the issuance paperwork and there was no evidence he received notice of the intended issuing of any stock. In September 2007, at a purported directors board and shareholder meeting, another purported class A stock issuance to current stockholders was unauthorized. Again, Mr. Bramlett was absent from this meeting. Additionally, the shares issued would have exceeded the amount authorized by the articles of incorporation.

Plaintiff had officially amended its articles of incorporation by filing an amendment with the Secretary of State on February 25, 2009. This amendment permitted plaintiff to issue up to 100 million shares of class A stock and 100 million shares of class B stock. Mr. Thiers sold back his shares on February 21, 2011. Then, plaintiff issued the following class A stock shares: 2,281 shares to Edward Mazzarino; 1 share for each 10 days a plaintiff employee worked for the corporation; and 3,000 shares to the law firm of Luce Forward. The Luce Forward firm later sold back its shares to plaintiff.

### 3. Ms. Rushakoff's Testimony

Ms. Rushakoff testified she was a member of plaintiff's directors board in October 2010. Ms. Rushakoff later admitted sending an e-mail to Theona Zhordania, plaintiff's attorney, in December 16, 2012. Ms. Rushakoff wrote that she was never on the directors board. Ms. Rushakoff denied representing to third parties that Mr. Corwin was elected as plaintiff's president. Ms. Rushakoff later admitted sending a letter in August 2011 to plaintiff's lessor. In that letter, she wrote that Mr. Corwin was plaintiff's president. Ms. Rushakoff testified to having a romantic relationship with defendant which she broke off in January or February of 2010.

12

Ms. Rushakoff testified that she sent a letter to Mr. Corwin and Mr. Bramlett on February 13, 2011 notifying them they had been terminated as employees of plaintiff. She testified Mr. Corwin and Mr. Bramlett were also removed from plaintiff's directors board. Ms. Rushakoff was hired back at plaintiff on February 15, 2011, and worked there until January 2012. She testified that she worked there to continue her health insurance.

Ms. Rushakoff testified she was appointed to plaintiff's directors board during an annual shareholder meeting in October 2010 in which only Mr. Wagoner, defendant and she were present. When deposed, defendant stated Mr. Bramlett, Ms. Malisich and Rebecca White were also present at this 2010 shareholder meeting. Ms. Rushakoff did not know why defendant had removed Mr. Corwin and Mr. Bramlett as directors on February 13, 2011. This occurred when she was purportedly already a director with Mr. Wagoner as of October 2010. Ms. Rushakoff testified to taking a trip to San Antonio, Texas, with defendant and her six year-old son in November 2010 for Thanksgiving. The trip expenses were charged to plaintiff.

In October 2012, Ms. Rushakoff hired plaintiff's counsel, the law firm of McKenna, Long & Aldrich, to represent her in a paternity suit against defendant. Ms. Rushakoff was also represented by an attorney with the McKenna, Long & Aldrich firm, Ms. Zhordania. In that capacity, Ms. Zhordania reviewed Ms. Rushakoff's e-mails. Ms. Rushakoff denied that Ms. Zhordania had permission to use those e-mails in the present litigation. Rather, according to Ms. Rushakoff, Ms. Zhordania and the McKenna, Long & Aldrich firm could only use those e-mails in connection with the paternity action against defendant. But Ms. Rushakoff admitted never objecting to the review of her e-mails for use in the present litigation against defendant. And Ms. Rushakoff also admitted she provided the entire paternity action files to defendant and its attorneys prior to retaining the law firm to represent her in the paternity action.

### 4. Ms. Malisich's Testimony

Ms. Malisich began working for plaintiff in September 2008. She was hired to be the accountant. She ceased working for plaintiff on August 25, 2011. On February 14, 2011, she received an e-mail from defendant that Mr. Corwin and Mr. Bramlett had been fired. Ms. Malisich testified that any check issued or debit card purchase by plaintiff needed some invoice or backup record. Ms. Malisich received plaintiff's stock shares in March 2011.

### C. Statement of Decision and Judgment

On October 3, 2013, the trial court issued its 48-page statement of decision. The trial court found Mr. Corwin and Ms. Malisich's testimony to be credible. The trial court found Ms. Rushakoff and defendant's testimony was not credible. The trial court determined defendant's testimony was evasive and regularly impeached.

The trial court ruled plaintiff's directors board had standing to bring this action. The trial court found plaintiff's directors board from August or September 2008 until March 4, 2011, was composed of Mr. Corwin, Mr. Bramlett, Mr. Van Niekerk and defendant. Mr. Corwin and Mr. Bramlett were not lawfully removed as directors in October 2010. The trial court found defendant failed to present any evidence he had sent notice of a shareholder meeting. Such notice was required in order to elect new directors under the Corporations Code. Without such notice, any action taken at the shareholder meeting was null and void.

The trial court also found defendant failed to remove Mr. Corwin, Mr. Bramlett or Mr. Van Niekerk as directors during a purported emergency shareholder meeting on February 13, 2011. Again, the trial court found defendant failed to provide notice as required under the Corporations Code. The trial court found it implausible that defendant held several emergency shareholder meetings on February 13, 2011. This was the date he removed Ms. Rushakoff from the directors board and then proposed adding her the same

14

day. The trial court found defendant's alleged issuance of shares beyond the number authorized by the articles of incorporation was void. This included all of the stock purportedly issued between November 8, 2004 until February 25, 2009. The trial court concluded the subsequent February 25, 2009 amendment to the articles of incorporation did not retroactively validate the void shares.

Prior to February 21, 2011, the trial court found defendant had only 56 percent of validly issued shares of plaintiff. Defendant did not have a sufficient number of shares to remove a director by written consent from a three- or four-person board under Corporations Code section 303, subdivision (a)(1). The trial court determined that defendant would need 75 percent plus 1 share of the outstanding valid shares to remove 1 director from a 3-member board. For a 4-member board, the trial court found defendant would need 80 percent plus one share of the outstanding valid shares. The court found after February 21, 2011, plaintiff's directors board issued an additional 6,982 shares. Defendant owned 500 of 7,867 validly issued shares, which was less than 10 percent of the outstanding valid shares. As a result, the trial court found defendant did not have sufficient shares to remove a director by written consent.

The trial court found plaintiff proved defendant had breached his fiduciary duty by misappropriating $937,069.71 of plaintiff's money for personal, non-business-related purposes. The trial court concluded defendant had mismanaged the company and engaged in inappropriate conduct. The trial court declined to award punitive damages because plaintiff failed to produce meaningful evidence of defendant's financial condition. The trial court ordered judgment entered in favor of plaintiff and against defendant for the amount of $937,069.71.

## III.  DISCUSSION

### A.  Standards of Review

We review questions of law de novo.  (*Unlimited Adjusting Group, Inc. v. Wells Fargo Bank, N.A.* (2009) 174 Cal.App.4th 883, 893; *The Fifth Day, LLC v. Bolotin* (2009) 172 Cal.App.4th 939, 946-947.)  The trial court's resolution of disputed factual issues is reviewed for substantial evidence.  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 958; *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430, fn. 5.)  Admissibility of evidence is reviewed for an abuse of discretion.  (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078; *People v. Alvarez* (1996) 14 Cal.4th 155, 203.)  Issues of credibility are not reviewed on appeal.  (*Cahill v. San Diego Gas &. Electric Co.*, *supra*, 194 Cal.App.4th at p. 958; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

### B.  Standing

#### 1.  Defendant's contentions

Defendant contends plaintiff's directors board lacked standing to bring this action because it was not validly elected.  Our Supreme Court held:  "It is fundamental that a corporation is a legal entity that is distinct from its shareholders.  [Citation.]  The authority to manage the business and affairs of a corporation is vested in its board of directors, not in its shareholders.  [Citations.]  This includes the authority to commence, defend, and control actions on behalf of the corporation."  (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108; *Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787.)  If the board of directors was not validly elected, it would lack the authority to commence an action on behalf of the corporation.

16

Defendant contends he held over 85 percent of the voting shares in plaintiff. Defendant maintains Mr. Corwin and Mr. Bramlett were replaced as directors by Ms. Rushakoff and Mr. Wagoner. Defendant relies on exhibits he has failed to properly add to the record. In that sense, the record is insufficient to address many of defendant's claims. (*Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 46; *Hernandez v. California Hosp. Med. Ctr.* (2000) 78 Cal.App.4th 498, 502.) Even if defendant did submit these exhibits, substantial evidence supports the trial court's findings that the directors board had standing to bring this action.

## 2. Shareholder election and notice

Substantial evidence supports the trial court finding defendant failed to validly remove Mr. Corwin and Mr. Bramlett as directors during a shareholder meeting because proper notice was not served. Defendant argued that at both an October 26, 2010 and February 13, 2011 shareholder meeting Mr. Corwin and Mr. Bramlett were removed as directors. Under plaintiff's by-laws, at a shareholder meeting directors can be elected or removed. Corporations Code section 601, subdivision (a) requires written notice of shareholder meetings. Failure to comply with notice requirements for a shareholder meeting render any action taken at the meeting invalid and void. (Corp. Code, § 601, subd. (f) ["Any shareholder approval at a meeting . . . shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice."]; *Spencer v. Older* (1982) 133 Cal.App.3d 95, 102-103; *Grant v. Hartman Ranch Co.* (1961) 193 Cal.App.2d 497, 501.) Defendant conceded he did not send a shareholder meeting notice to Mr. Jahangiri, Mr. Joostens or Mr. Lee. Article I, section 6 of plaintiff's by-laws provides in part: "The transactions of any meeting, however called and noticed, and wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum is present and if, either before or after the meeting, each of the shareholders or his proxy signs a written waiver of notice or a consent to the holding of the meeting or an approval of the minutes thereof. All such

17

waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting." There is no evidence that these shareholders waived notice and consented to the shareholder meeting as required by the by-laws.

Additionally, the October 26, 2010 statement of information filed with the Secretary of State indicated no changes from the previously filed statement of information. The previous statement of information, filed February 21, 2009, indicated Mr. Corwin, Mr. Bramlett, Mr. Van Niekerk and defendant were plaintiff's directors. Article II, section 3 of plaintiff's by-laws provides, "[D]irectors who are elected to replace any or all of the members of the initial Board of Directors or who are elected at an annual meeting of shareholders, and directors who are elected in the interim to fill vacancies, shall hold office until the next annual meeting of shareholders and until their successors have been elected and qualified, or until their earlier resignation, removal from office, or death." Thus, substantial evidence supports the trial court finding Mr. Corwin and Mr. Bramlett were not removed as directors during a shareholder meeting.

### 3. Removal of Director by Written Consent

Substantial evidence also supports the trial court's finding defendant lacked the requisite shares to remove Mr. Corwin, Mr. Bramlett or Mr. Van Niekerk as directors by written consent. Corporations Code section 303, subdivision (a)(1) provides in part: "Any or all of the directors may be removed without cause if the removal is approved by the outstanding shares . . . subject to the following: [¶] . . . no director may be removed (unless the entire board is removed) when the votes cast against removal, or not consenting in writing to the removal, would be sufficient to elect the director if voted cumulatively at an election at which the same total number of votes were cast (or, if the action is taken by written consent, all shares entitled to vote were voted) and the entire number of directors authorized at the time of the director's most recent election were then being elected."

18

Plaintiff's articles of incorporation were not amended until February 25, 2009. Plaintiff's original article of incorporation permitted only the issuance of 1,500 shares. Shares issued in excess of plaintiff's articles of incorporation are void and confer no rights. (Corp. Code, § 202, subd. (f) [the articles of incorporation shall set forth, "[i]f the corporation is authorized to issue only one class of shares, the total number of shares which the corporation is authorized to issue."]; *Tulare Savings Bank v. Talbot* (1900) 131 Cal. 45, 48 [overissuance of shares beyond amount authorized by articles of incorporation is void]; *Herkner v. Rubin* (1932) 126 Cal.App. 677, 681 ["Where a statute prohibits or attaches a penalty to the doing of an act the act is void [citation]; and this is true of an issuance of stock in violation of the permit granted by the corporation commissioner [citations]."]; see 11 Fletcher Cyclopedia of the Law of Corporations (2014) § 5144 ["Where the corporation has previously issued shares to its authorized limit, it cannot issue additional shares. An agreement to issue shares when there is no power to issue them is illegal and void, and that which issues is not stock."] [fns. omitted.]) Substantial evidence supports the trial court's finding that from April 4, 2004, until June 27, 2007, when Mr. Thiers sold back his shares, all 1,500 of plaintiff's authorized shares had been issued. Any issuance of shares in excess of the amount authorized under plaintiff's articles of incorporation were void.

Any purported issuance of shares after plaintiff bought back shares from Mr. Thiers and Mr. Van Niekerk were also void. Under plaintiff's articles of incorporation and the Corporations Code, only the board of directors had authority to issue stock. (Corp. Code, § 409, subd. (a)(1).) Defendant provided no evidence which would demonstrate plaintiff's directors board authorized the issuance of stock. The February 25, 2009 amendment to the articles of incorporation did not retroactively render any of the void share issuances valid. (See *Columbia Engineering Co. v. Joiner* (1965) 231 Cal.App.2d 837, 856 ["the doctrines of estoppel by conduct and ratification have no application to a contract which violates an express mandate of the law"]; *Herkner v. Rubin*, *supra*, 126 Cal.App. at p. 681 [same].) Thus, all of defendant's purported stock issuances prior to February 25, 2009, were void.

19

By the time of the purported October 26, 2010 shareholder meeting, substantial evidence supports the trial court's finding of the following distribution of shares: defendant owned 500 shares; Mr. Van Niekerk owned 205 shares; Mr. Klein and Mr. Jahangiri owned 75 shares each; and Mr. Joostens owned 30 shares. Plaintiff had a four-member board of directors at the time of the purported October 26, 2010 shareholder meeting. Each share is the equivalent of one vote for each director position. Under cumulative voting, a shareholder can combine the shares she or he would have used for each director together. (See 9 Witkin, Summary of Cal. Law (10th ed. 2005), Corporations, § 162, p. 935 ["[I]f there are 5 directors to be elected, and the shareholder has 10 voting shares, the shareholder has 10 votes for each director or a total of 50 votes, and may cast them all for one director. The purpose of cumulative voting is to permit minority shareholders to combine and secure some representation on the board."].)

In this instance, defendant owned 500 of the outstanding shares. The other shareholders owned a combined 385 voting shares. There were thus a total of 885 outstanding shares. On a four-member board, the percentage of the total shares needed to elect one director is calculated as follows: "[S]imply make a fraction out of the *total number of directors being elected* (e.g., if 3 directors are to be elected, the fraction is 1/3), and then augment the denominator *by one* (i.e., the fraction becomes 1/(3+1) = 1/4). The number of shares needed out of the total shares voting to elect *one* director, expressed as a fraction (or percentage) of the total, is thus 1/4 (25%) *plus one (or, rounded upward to the next whole share*)." (Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2014) ¶ 3:153.1.) For a four-member board, cumulative voting by the minority shareholders would have required one fifth of the outstanding shares, plus one share. (*Ibid.*) To overcome cumulative voting, defendant would have needed 80 percent of the outstanding shares to remove any director. At the time of the purported October 2010 shareholder meeting , defendant had approximately 56 percent of the outstanding shares. Defendant thus lacked the requisite shares to remove any of the other directors on his own. This likewise applied to defendant's purported removal of Mr. Corwin and Mr. Bramlett as directors on February 13, 2011, or at any other time.

20

Substantial evidence supports the trial court finding that after February 21, 2011, plaintiff's directors board validly issued an additional 6,982 shares of class A stock. The minutes from a February 21, 2011 directors board meeting indicated distribution of these shares. Defendant did not receive any additional stock. Thus, defendant's percentage of valid outstanding voting shares was further reduced to below 10 percent. Defendant lacked the requisite shares to overcome cumulative voting and remove a director by written consent after February 21, 2011.

Substantial evidence also supports the finding that after March 4, 2011, plaintiff's directors board was Mr. Bramlett, Mr. Corwin and Mr. Van Niekerk. Minutes from a March 4, 2011 special shareholder meeting indicate Mr. Bramlett, Mr. Corwin and Mr. Van Niekerk were elected by the shareholders as the directors board. Accordingly, plaintiff's directors board, Mr. Bramlett, Mr. Corwin and Mr. Van Niekerk, had standing to authorize the filing of an action against defendant for fiduciary duty breach.

C. Fiduciary Duty Breach and Business Judgment Rule

Defendant contends he did not breach any fiduciary duty to plaintiff because he was the majority shareholder. Thus, he reasons he cannot be held liable for breach of duty against himself. This argument is without merit. Defendant as a corporate officer and director owed a fiduciary duty to the corporation and other shareholders. (See *Los Angeles Memorial Coliseum Commission v. Insomniac, Inc.* (2015) 233 Cal.App.4th 803, 834 ["[O]fficers of corporations who participate in the management of the corporation are considered fiduciaries as a matter of law."]; Corp. Code, § 309, subd. (a) ["A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."].) Corporate directors owe a duty to act with honesty, loyalty and good faith in the best interests of the corporation and its

21

shareholders.  (See *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1037; *Lehman v. Superior Court* (2006) 145 Cal.App.4th 109, 120-121.)

Defendant also contends his conduct is protected under the business judgment rule.  This issue was never raised in the trial court.  Defendant forfeited raising the business judgment rule argument on appeal by failing to properly raise it before the trial court.  (*Windiate v. Moore* (1962) 201 Cal.App.2d 509, 516; *Hearst Publishing Co. v. Abounader* (1961) 196 Cal.App.2d 49, 58.)

Even were we to consider this argument, defendant has not demonstrated how he is entitled to the business judgment rule on appeal.  The Courts of Appeal have held: "The business judgment rule is a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. [Citation.]  'The rule is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes.  [Citations.]  The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.'  [Citation.]  An exception to this presumption exists in circumstances which inherently raise an inference of conflict of interest. [Citation.]  The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest.  [Citation.]" (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 429-430; accord, *Kruss v. Booth* (2010) 185 Cal.App.4th 699, 728.)  Based on the trial court's findings which are supported by overwhelming evidence, defendant engaged in conduct that misused corporate funds for personal use.  This is a clear conflict of interest and demonstrative of improper motive by defendant.  On direct appeal, defendant failed to demonstrate he is entitled to the protection of the business judgment rule.

## D. Discovery Challenges

Defendant contends the trial court erred by permitting plaintiff to introduce into evidence documents which he had requested prior to trial. Defendant asserts those documents were not produced until trial. Defendant has failed to provide this court with an adequate record to review the trial court's rulings regarding pretrial disclosure. A party challenging a judgment has the burden of showing reversible error by an adequate record. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574; *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.) In the absence of a proper record on appeal, the judgment is presumed correct and must be affirmed. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296; *Ballard v. Uribe*, *supra*, 41 Cal.3d at p. 574.) Defendant did not submit his relevant motion to compel nor plaintiff's purportedly inadequate response. Thus, we cannot determine from the record before us whether the trial court erred by admitting the challenged documents.

## E. Other Arguments

Defendant briefly raises other arguments. First, he contends the Hanmi Bank loan prohibits plaintiff from having a change in ownership. Defendant fails to explain how this is relevant to plaintiff's fiduciary duty breach cause of action.

Second, defendant argues he had insufficient time for his defense. We construe this as defendant arguing he was denied the right to offer relevant and competent evidence at trial in violation of due process. (See, e.g., *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357 ["Ordinarily, parties have the right to testify in their own behalf [citation], and a party's opportunity to call witnesses to testify and to proffer admissible evidence is central to having his or her day in court."]; *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 292 [trial court abandoning trial during party's case-in-chief was reversible error].) Defendant's contention is contradicted by the record. Defendant on several occasions stated to the court he only needed two or three days to present his

23

defense.  Defendant presented his case-in-chief in two or three days.  The trial court also told defendant he can take as much time as he needed.  Defendant's argument here is without merit.

Third, defendant contends Mr. Corwin lacked sufficient knowledge and experience to testify.  The trial court found Mr. Corwin to have sufficient personal knowledge to testify to the matters concerning defendant's misuse of corporate funds.  Mr. Corwin had personal knowledge from working at plaintiff and his educational background.  Defendant presents no arguments indicating the trial court abused its discretion by admitting Mr. Corwin's testimony.

Fourth, defendant contends plaintiff suffered no damages because he is the majority shareholder.  This is not supported by the record or the law.  A corporation is a separate entity from its shareholders.  (*Grosset v. Wenaas*, *supra*, 42 Cal.4th at p. 1108; *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 729.)

Fifth, defendant argues there was extreme bias by the plaintiff's witnesses.  Defendant fails to cite to any applicable law.  To the extent defendant contends plaintiff's witnesses' testimony should not have been admitted, this argument is frivolous.  The trial court did not abuse its discretion by admitting the challenged witnesses' testimony.

Sixth, defendant also contends plaintiff failed to meet its burden of proof for a fiduciary duty breach.  This is without merit.  Substantial evidence is the applicable standard of review on appeal here, regardless of the burden of proof at trial.  (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *Sasco v. Cal. Fair Employment and Housing Com.* (2009) 176 Cal.App.4th 532, 545, fn. 7.)  To the extent defendant challenges the sufficiency of the evidence, substantial evidence supports the judgment.  A fiduciary duty breach claim is stated under the following circumstances:  "The elements of a cause of action for breach of fiduciary duty are:  (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach."  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086; accord, *Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1164.)  As noted, defendant as a director and officer, owed plaintiff a fiduciary

duty.  The evidence before the trial court overwhelmingly support the finding that defendant misused corporate funds for his personal use.

## IV.  DISPOSITION

The judgment is affirmed.  Plaintiff, CalPOP.com, Incorporated may recover its appeal costs from defendant, Richard Land Hoover.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


KRIEGLER, J.


KIRSCHNER, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.